STATE OF NORTH CAROLINA v. SHONTEZ ANTERIO BARNES

No. COA02-1418

(Filed 1 July 2003)

**1. Search and Seizure— warrantless entry into house—no exigent circumstances**

The entry into a house by officers was a warrantless, non-consensual search, presumptively in violation of the Fourth Amendment, where the officers suspected drug activity at the house, approached quietly at night, and followed when defendant ran from the porch into the house. The State does not argue that exigent circumstances were present.

**2. Search and Seizure— plain view—lawfulness of officer's presence—first determination**

The trial court erred by considering whether cocaine found within a house was in plain view without first determining whether officers had a right to be in the house.

**3. Constitutional Law— search of house—reasonable expectation of privacy—defendants' burden**

The trial court applied an erroneous standard to determining whether a cocaine defendant could raise a constitutional challenge to the search of a house rented by another person where the court ruled that defendant had standing or the right to raise the issue "nothing else appearing." Defendants are required to show an actual and reasonable expectation of privacy.

**4. Constitutional Law— search of house—expectation of privacy—insufficient evidence for determination**

The record contained insufficient evidence for an appellate review of the trial court's conclusion that defendant had standing for a constitutional challenge to a search of a house. The trial court may have inadvertently discouraged both attorneys from presenting all of their evidence.

**5. Constitutional Law— search of house—standing—failure to determine—prejudicial**

The failure to properly determine whether defendant had standing to constitutionally challenge a search was prejudicial because defendant was charged with possession of cocaine. There is a reasonable possibility of a different result if the cocaine had been suppressed.

Appeal by defendant from judgment entered 3 July 2002 by Judge Milton F. Fitch, Jr., in Wilson County Superior Court. Heard in the Court of Appeals 11 June 2003.

*Attorney General Roy Cooper, by Assistant Attorney General Jeffrey R. Edwards, for the State.*

*Hosford & Hosford, P.L.L.C., by Sophie W. Hosford, for defendant-appellant.*

LEVINSON, Judge.

Defendant (Shontez Barnes) appeals from convictions of possession of cocaine and possession with intent to sell and deliver cocaine. For the reasons that follow, we reverse and remand.

On 21 September 2000, law enforcement officers entered a residence located at 210 N. East Street, ("the house") in Wilson, North Carolina, where the defendant was present. Shortly after entering the house, the police saw what appeared to be cocaine either falling, or being dropped, from defendant's pocket. The law enforcement officer confiscated the cocaine, and searched the defendant, who was also in possession of approximately $390 in currency. Defendant was arrested and charged with possession of cocaine, and possession with intent to sell and deliver cocaine. The house was searched and other items were discovered, including currency, crack cocaine, marijuana, two sets of scales, a night vision monocle, and two walkie-talkies. Several other individuals were found within the house, and some were charged with various offenses. Prior to trial, defendant filed a motion to suppress the evidence seized from his person and from the house at the time of his arrest.

A *voir dire* was conducted during trial, at which time testimony was elicited from one witness, Officer Jeff Boykin of the Wilson Police Department, the officer who had searched and arrested defendant. Boykin testified that he had been observing the house for more than a month. During this time, Boykin often saw defendant sit-

ting or standing on the porch of the house, and noticed that defendant sometimes ran inside the house when the police approached it. Boykin also testified that he observed an unusually high number of visitors to the house, most of whom left after a brief visit. Additionally, two weeks before defendant's arrest, Boykin received a tip from a confidential informant that several people, including the defendant, were selling drugs at the house. Based on information from the informant and on his own observations, Boykin suspected that drugs were being sold in the house. Consequently, he went to the house about two weeks before defendant's arrest, knocked, and spoke with Ms. Carolyn Simms, the person in whose name the house was rented. Boykin warned Simms that she would face legal consequences if she could not "control" the activities within the house. Although Boykin knew defendant was present at the house, he did not speak with him at that time.

Shortly after midnight on 21 September 2000, Boykin and three other law enforcement officers approached the house on bicycles. Boykin testified that "[t]he way the residence is laid out . . . if there's anybody on the porch, they won't see you . . . until the last possible second when you're in front of them." Boykin stated that on the night in question "it was dark, we were quiet. [At the l]ast possible second, we got in front of that house[]" whereupon Boykin "shined [his] flashlight onto the porch[.]" At that point the defendant and another man "jumped out of their chair, acted like they were scared, and attempted to go in the front door." When Boykin saw defendant and the other man getting up from their chairs to go inside the house, he and the other officers set down their bicycles and went up the steps and into the house. When they got inside, Boykin saw defendant with his hand inside his pocket, then saw a bag of what appeared to be crack cocaine fall out onto a coffee table. Thereupon, Boykin searched and arrested defendant, while the other law enforcement officers searched the rest of the house.

At the close of the *voir dire*, the trial court ruled that the cocaine and money seized from defendant's person were admissible at trial, but that evidence of the other items found in the house should be suppressed. At trial, defendant was convicted of possession of cocaine and possession with intent to sell and deliver cocaine. He was sentenced for possession with intent to sell and deliver cocaine, and judgment was arrested on the charge of possession of cocaine. From this conviction and sentence, defendant appeals.

**[1]** Defendant argues on appeal that the trial court erred by denying his motion to suppress the cocaine and money seized from him when the law enforcement officers followed him inside the house. We conclude that the trial court's order was based upon errors of law, and must be reversed.

In its ruling on defendant's suppression motion, the trial court stated, in pertinent part, the following:

> *Unless search exists* from the *mere fact of the officers entering the home,* that *does not concern me,* and the *issue of search* as such in the home *is a matter that this defendant, nothing else appearing,* has the right or the *standing to raise.*

> I *do not think* that *there was a search* as of such *involving the defendant because, . . .* the *drugs appeared on the table* as having fallen from his pocket. I think it's a better practice to be used under the totality of the situation that these officers—better police practice would have been to—to obtain a warrant. The [confidential informant's] information per two weeks, nothing else appearing, would probably be stale.

(emphasis added). Thus, in its ruling on defendant's suppression motion, the trial court apparently (1) held that the "mere" entry into the house by law enforcement officers did not constitute a search; (2) assumed that, "nothing else appearing" the defendant had standing to contest the search of the house; and (3) concluded that the cocaine was not seized pursuant to a search of defendant, because it was in plain view of the officer. In these assumptions and conclusions, the trial court erred.

---

The Fourth Amendment to the U.S. Constitution provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."

> The Fourth Amendment is applicable to the states through the Due Process Clause of the Fourteenth Amendment. Similarly, the Constitution of the State of North Carolina provides that 'general warrants, whereby any officer or other person may be commanded to search suspected places without evidence of the act committed, or to seize any person or persons not named, whose offense is not particularly described and supported by evidence, are dangerous to liberty and shall not be granted.'

*State v. Grooms,* 353 N.C. 50, 73, 540 S.E.2d 713, 728 (2000) (quoting N.C. Const. art. I, § 20) (citing *State v. Watkins,* 337 N.C. 437, 441, 446 S.E.2d 67, 69 (1994)), *cert. denied,* 534 U.S. 838, 151 L. Ed. 2d 54 (2001)..

In the instant case, the trial court held that the "mere" entry into the house by law enforcement officers was not a "search" within the meaning of the Fourth Amendment. However, generally speaking, an intrusion into a residence *is* a search within the meaning of the Fourth Amendment, for "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *United States v. United States District Court,* 407 U.S. 297, 313, 32 L. Ed. 2d 752, 764 (1972). Indeed, exclusion of the government from one's dwelling lies at the heart of the Fourth Amendment:

> A man's home is his castle. The storm and wind may enter, but the King cannot enter, and all the forces of the Crown cannot cross the threshold of his ruined tenement. These words by Lord Eldon served as the basis for that portion of the Fourth Amendment in the Bill of Rights declaring that the people shall be secure in their houses against unreasonable searches and seizures.

*Pledger v. State,* 257 Ga. App. 794, 797, 572 S.E.2d 348, 351 (2002). The United States Supreme Court recently held:

> 'At the very core' of the Fourth Amendment 'stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.' *With few exceptions, the question whether a warrantless search of a home is reasonable and hence constitutional must be answered no . . .* in the case of the search of a home's interior . . . there is a ready criterion, with roots deep in the common law, of the minimal expectation of privacy that exists, and that is acknowledged to be reasonable.

*Kyllo v. United States,* 533 U.S. 27, 31, 34, 150 L. Ed. 2d 94, 100 (2001) (police use of thermal imager to obtain information about inside of house constituted a search for 4th Amendment purposes) (quoting *Silverman v. United States,* 365 U.S. 505, 511, 5 L. Ed. 2d 734, 739 (1961)); *see also State v. Tarantino,* 322 N.C. 386, 368 S.E.2d 588 (1988) (officer's use of flashlight to peer between cracks of boarded up outbuilding is a search within the meaning of the Fourth Amendment), *cert. denied,* 489 U.S. 1010, 103 L. Ed. 2d 180 (1989); *State v. Wooding,* 117 N.C. App. 109, 449 S.E.2d 760 (1994) (finding unlawful search of apartment where officer looked in through small

gap in curtains). We conclude that the law enforcement officers' entry into the house constituted a "search" for purposes of the Fourth Amendment. Moreover, " '[i]t is a basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable.' " *State v. Smith*, 346 N.C. 794, 798, 488 S.E.2d 210, 213 (1997) (quoting *Payton v. New York*, 445 U.S. 573, 586, 63 L. Ed. 2d 639, 651 (1980)). In *Payton*, the United States Supreme Court stated:

> In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant.

*Payton*, 445 U.S. at 590, 63 L. Ed. 2d at 653. In the present appeal, the State does not argue that exigent circumstances were present. We conclude that the officers' entry into the house was a warrantless, nonconsensual search, and as such was presumptively in violation of the Fourth Amendment to the U.S. Constitution. Accordingly, the trial court erred by assuming otherwise.

[2] The trial court also concluded that there was no search of the defendant because "the defendant went into his pocket and the drugs appeared on the table as having fallen from his pocket." In essence, the trial court ruled that the cocaine was in "plain view" of Boykin after he entered the house. It is true that "under certain circumstances the police may seize evidence in plain view without a warrant." *Coolidge v. New Hampshire*, 403 U.S. 443, 465, 29 L. Ed. 2d 564, 582 (1971). However, "the initial intrusion which brings the evidence into plain view must be lawful" for the "plain view" exception to apply. *State v. Williams*, 315 N.C. 310, 317, 338 S.E.2d 75, 80 (1986). "Whether or not the warrantless seizure of items in plain view is reasonable under the Fourth Amendment depends on several factors. First, officers must not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed." *State v. Nance*, 149 N.C. App. 734, 740, 562 S.E.2d 557, 561 (2002) (plain view exception to warrant requirement of Fourth Amendment not applicable where officers' entry onto property was unlawful and was not justified by exigent circumstances). Thus, the trial court erred by considering the fact that the cocaine was in plain view without *first* determining whether the officers had a lawful right to be present in the house. Similarly, the State argues on appeal that the defendant forfeited his privacy interest in the cocaine when he dropped it on the

table. Again, this begs the question of whether law enforcement officers were rightfully present in the home.

[3] We next consider the trial court's determination that this defendant was entitled to challenge the search of the house. A defendant's rights "against unreasonable searches and seizures under the Fourth Amendment are personal and, unlike some constitutional rights, may not be asserted by another." *State v. Monk*, 291 N.C. 37, 50, 229 S.E.2d 163, 172 (1976) (citing *Brown v. United States*, 411 U.S. 223, 36 L. Ed. 2d 208 (1973)). Thus:

> Before defendant can assert the protection afforded by the Fourth Amendment, however, he must demonstrate that any rights alleged to have been violated were his rights, not someone else's. A person's right to be free from unreasonable searches and seizures is a personal right, and only those persons whose rights have been infringed may assert the protection of the Fourth Amendment.

*State v. Ysut Mlo*, 335 N.C. 353, 377, 440 S.E.2d 98, 110, *cert. denied*, 512 U.S. 1224, 129 L. Ed. 2d 841 (1994). Additionally, under N.C.G.S. § 15A-972 (2001), only "a defendant who is aggrieved may move to suppress evidence[.]" The North Carolina Supreme Court interprets G.S. § 15A-972 as follows:

> [W]e hold that a defendant is aggrieved and may move to suppress evidence under G.S. 15A-972 only when it appears that his personal rights, not those of some third party, may have been violated, and such defendant has the burden of establishing that he is an aggrieved party before his motion to suppress will be considered.

*State v. Taylor*, 298 N.C. 405, 415-16, 259 S.E.2d 502, 508 (1979) (citations omitted).

As a general rule, "in a suppression hearing, the State has the burden to demonstrate the admissibility of the challenged evidence." *State v. Tarlton*, 146 N.C. App. 417, 420, 553 S.E.2d 50, 53 (2001) (citing *State v. Harvey*, 78 N.C. App. 235, 237, 336 S.E.2d 857, 859 (1985)). However, the defendant has the burden to establish his right to contest a challenged search. *Ysut Mlo*, 335 N.C. at 378, 440 S.E.2d at 110-11; *State v. Greenwood*, 301 N.C. 705, 708, 273 S.E.2d 438, 441 (1981) ("defendant [has] the burden of demonstrating an infringement of his personal rights by a search").

Although a defendant's entitlement to Fourth Amendment protections is frequently referred to as his "standing" to object to a search, the United States Supreme Court explained in *Minnesota v. Carter*, 525 U.S. 83, 84, 142 L. Ed. 2d 373, 376 (1998), that "the rubric of 'standing' doctrine [has been] expressly rejected. . . . [T]o claim Fourth Amendment protection, a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable." Under some circumstances a defendant who is not the legal owner or lessee of a house may nonetheless have a reasonable expectation of privacy while on the premises. For example, in *Minnesota v. Olson*, 495 U.S. 91, 96-97, 109 L. Ed. 2d 85, 93 (1990), the United States Supreme Court held "that [defendant's] status as an overnight guest is alone enough to show that he had an expectation of privacy in the home that society is prepared to recognize as reasonable." The Court explained that its holding "merely recognizes the everyday expectations of privacy that we all share." *Id.* at 98, 109 L. Ed. 2d at 94. The values underlying *Olson* have also been recognized in situations other than those involving overnight houseguests:

> [Plaintiff] was not an overnight guest. Nevertheless, the principles that guided *Olson* are applicable to her. [She] was a frequent visitor at the Mealey residence. . . . She often ran errands for Ms. Mealey, whom everyone called 'Grandma'. . . . We believe that [her] activities—visiting a neighbor and assisting the elderly—establish an expectation of privacy that is 'recognized and permitted by society.'

*Bonner v. Anderson*, 81 F.3d 472, 475 (4th Cir. 1996). In *Minnesota v. Carter*, 525 U.S. 83, 142 L. Ed. 2d 373, the Court refined its holding in *Olson*, drawing a distinction between social visitors and those present only for a business transaction:

> *Respondents* here were obviously not overnight guests, but *were essentially present for a business transaction* and were only in the home a matter of hours. There is *no suggestion that they had a previous relationship* with [tenant of apartment], *or that there was any other purpose to their visit. Nor was there* anything similar to the overnight guest relationship in *Olson* to suggest *a degree of acceptance into the household.*

*Id.* at 90, 142 L. Ed. 2d at 473 (emphasis added). In a Georgia case, the defendant, who was on the porch of his girlfriend's sister's apartment,

ran inside when the police approached the area. The Georgia Court of Appeals held:

> As no criminal activity was observed by police, the mere fact that . . . appellee 'ran' inside the apartment when the police drove up did not provide probable cause and/or exigent circumstances authorizing the police to enter Jennifer Tabb's home to arrest appellee without a warrant. . . .
>
> [A]ppellee had a legitimate expectation of privacy in the apartment of Jennifer Tabb. He was a frequent welcome social visitor, he left possessions there, and he had spent the night as a social guest. That he may not have been spending the night on this occasion does not alter his status as Tabb's social guest. He had been allowed previously to 'seek shelter' by entering her house on a recurring basis, and that is what he did on this occasion—he entered her house. As the evidence viewed to support the trial court's ruling shows, he was not a stranger standing on the street; he was not seen doing anything illegal.

*State v. Brown*, 212 Ga. App. 800, 801-03, 442 S.E.2d 818, 819-21 (1994).

In sum, a defendant challenging a Fourth Amendment violation occurring in the home of another must demonstrate a "legitimate expectation of privacy, which has two components: (1) the person must have an actual expectation of privacy, and (2) the person's subjective expectation must be one that society deems to be reasonable." *State v. Wiley*, 355 N.C. 592, 602, 565 S.E.2d 22, 32 (2002), *cert. denied*, 537 U.S. 117, 154 L. Ed. 2d 795 (2003).

In the instant case we conclude that the trial court may have applied an erroneous legal standard to the issue of whether defendant could properly challenge the search of the house. In its ruling, the court stated that "the issue of search as such in the home is a matter that this defendant, *nothing else appearing*, has the right or the standing to raise." We interpret the phrase "nothing else appearing" to be a shorthand expression for "nothing else appearing to the contrary." Thus, the trial court appears to assume that, in the absence of evidence requiring a contrary ruling, the default setting would be that the defendant had standing to contest the search. As discussed above, the law requires defendant to show that he had an actual and reasonable expectation of privacy in the house.

STATE v. BARNES

[158 N.C. App. 606 (2003)]

[4] Moreover, we conclude that we cannot determine from the evidence presented on *voir dire* whether the trial court correctly ruled that the defendant was entitled to challenge the search of the house. "The applicable standard in reviewing a trial court's determination on a motion to suppress is that the trial court's findings of fact 'are conclusive on appeal if supported by competent evidence, even if the evidence is conflicting.' " *State v. Barden*, 356 N.C. 316, 332, 572 S.E.2d 108, 120-21 (2002) (quoting *State v. Eason*, 336 N.C. 730, 745, 445 S.E.2d 917, 926 (1994), *cert. denied*, 513 U.S. 1096, 130 L. Ed. 2d 661 (1995)), *cert. denied*, —— U.S. ——, 155 L. Ed. 2d 1074 (2003). Therefore, we would ordinarily examine the record to determine whether the trial court's conclusion that the defendant had "standing" to challenge the search of the house was supported by competent evidence. However, our review of the transcript indicates that there was insufficient evidence presented on this issue to enable us to reach a determination, and suggests the trial court may have inadvertently discouraged counsel for the State and the defendant from presenting all their evidence relevant to this issue.

The trial court was an active participant in conducting the *voir dire*. Initially the prosecutor questioned Boykin about the sequence of events surrounding defendant's arrest, which occupies about five pages of transcript testimony. At the end of the *voir dire*, defendant cross-examined Boykin, which also occupies about five pages of transcript. But, sandwiched between the examinations conducted by the State and defendant are at least twelve pages of testimony and discussion directed or conducted by the trial court. The trial court focused primarily on the lack of a search warrant, and questioned Boykin extensively about his failure to obtain a search warrant prior to approaching the house. This was certainly a valid concern for the court to address. However, in the course of the *voir dire*, the trial court indicated several times that it was disinclined to hear evidence on the issue of standing. In the course of its soliloquy, the trial court stated, in pertinent part:

THE COURT: I want to know—if I see an officer and I turn and go the other way, by what right does that officer come in hot pursuit of me? And certainly when I go into a residence—here's an officer who . . . has sent a confidential and reliable informant who brings him back information that confirms what he suspects.

Now, our Constitution says that at that point in time you want to go in there, go get you a piece of paper. . . . Why these officers

didn't go get a . . . search warrant, rather than . . . go[ing] into what is the most precious thing that we have in a free society, and that is our castle.

Now, *whatever the relationship was between [defendant] and [Simms] I'm truly not concerned with.* But to go into someone's residence because they get up and leave at that time. . . .

(emphasis added). After some discussion regarding whether the law enforcement officers could justify their warrantless entry into the house on the basis of reasonable suspicion, the prosecutor shifted gears, and attempted to raise the question of defendant's entitlement to claim Fourth Amendment protection:

PROSECUTOR: Okay. Well, that brings me to my next issue, which is it's not the defendant's house. . . .

THE COURT: *Who says it's not the defendant's house?*

(emphasis added). After this remark by the trial court, no further evidence was adduced on defendant's standing to challenge the search, although the prosecutor and defense each presented brief arguments on the issue. The trial court then directed the voir dire back to the issue of the officer's conduct:

THE COURT: I am aware of the standing issue. . . . The defendant has standing to move to suppress evidence only when it appears that the defendant's personal rights, not those of a third party, have been threatened. And at this point in time *I don't know what the defendant's rights were as it pertains to that residence.*

*The thing that made my hair stand up is Officer Boykin's own words,* "If they ran, I was going to follow; if not, I was going to talk to them." *So there's a mind-set already made up that regardless of what occurred, I was going into that home.*

(emphasis added). Following the trial court's lead, the prosecutor engaged in a brief debate with the court regarding the officer's behavior. Then, although defense counsel had not yet had any opportunity to cross-examine the officer, the trial court asked:

THE COURT: Are you through [defense counselor]?

[DEFENSE COUNSEL]: Through with the argument on that point, Your Honor.

THE COURT: Do you wish to [cross-examine] the officer?

[DEFENSE COUNSEL]: Yes, Your Honor. Just a couple of questions, please. I think most of it has been covered.

We conclude that the trial court misapplied the law in regards to whether the law enforcement officers' entry into the house was a search, and on whether the concept of "plain view" was appropriately considered in this factual setting. We further conclude that the court may have been operating under a misapprehension about the defendant's standing to contest the officer's entry into the house. The trial court also may have prevented a full airing of all relevant evidence on the issue, thus preventing this Court from conducting our own review. We hold, therefore, that the trial court erred in its ruling on defendant's suppression motion.

[5] We also conclude that the trial court's error was not harmless in light of the facts of this case. N.C.G.S. § 15A-1443 (2001) provides in part:

A defendant is prejudiced by errors . . . when there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial out of which the appeal arises. The burden of showing such prejudice under this subsection is upon the defendant.

In the present case, defendant was charged and convicted of possession of cocaine. Clearly, if the cocaine were suppressed, there is a reasonable possibility that a different result would have been reached. Therefore, we conclude the trial court's failure to properly determine whether defendant had standing to challenge on Fourth Amendment grounds the law enforcement officers' entry into the residence constituted "reversible error which denied the defendant a fair trial conducted in accordance with law." N.C.G.S. § 15A-1447(a) (2001). Accordingly, defendant is entitled to a new trial at which the admissibility of the evidence seized from defendant will be determined in accordance with the law as explained herein:

[F]aced with the appraisal that the case had been tried in the main upon an unsound principle of law, we remanded it for another hearing or a new trial, as is the rule in this jurisdiction. Where a case is tried under a misapprehension of the law, the practice is to remand it for another hearing.

*State v. Williams*, 224 N.C. 183, 189, 29 S.E.2d 744, 748 (1944) (citations omitted).

For the reasons discussed above, the defendant's conviction is

Reversed and the case Remanded for a New Trial.

Judges MARTIN and TYSON concur.